# DEPARTMENT OF BUSINESS REGULATION, DIVISION OF ALCOHOLIC BEVERAGES AND TOBACCO v PERRY d/b/a PERRY'S PACKAGE STORE

## Case No. 85-2950

State of Florida, Division of Administrative Hearings

October 3, 1985

### APPEARANCES OF COUNSEL

**Daniel J. Bosanko** for petitioner.

**David J. Busch** for respondent.

### OPINION

J. LAWRENCE JOHNSTON, Hearing Officer.

## RECOMMENDED ORDER

An immediate post-emergency suspension final hearing was held in this case on September 6, 1985, in Tallahassee. The issue is whether the facts alleged in the Notice To Show Cause in this case are true and whether those facts, to the extent that they are true, warrant revocation, suspension or other discipline of the license of Respondent, Alex Perry, d/b/a Perry's Package Store (Respondent). The Notice To Show Cause explicitly alleges several drug-related violations on the licensed premises and implicitly alleges the Respondent's culpable responsibility for the violations under Section 561.29(1)(a), Florida Statutes (1983). The Notice To Show Cause also alleges: that Respondent maintained the licensed premises as a store, shop or building or place which is visited by persons for the purpose of illegally keeping, selling or delivering illegal drugs, making the premises a public nuisance under Section 823.10, Florida Statutes (1983); and that Respondent maintained the licensed premises as a structure or place which is resorted to by persons for the purpose of keeping or selling illegal drugs in violation of Section 893.13(2)(a)(5), Florida Statutes (1983). Respondent denied the allegations, particularly the allegation of Respondent's culpable responsibility.

## FINDINGS OF FACT[1]

1. Respondent, Alex Perry, d/b/a Perry's Package Store (Respondent) has been licensed by Petitioner, Department of Business Regulation, Division of Alcoholic Beverages and Tobacco (Division) to sell alcoholic beverages under License No. 47-727, License Series 2-APS, for the licensed premises at 618 North Macomb Street, Tallahassee, Florida, at all times pertinent to this case.

2. The licensed premises consist of a small store where Respondent sells beer and wine as well as snacks and small grocery items. A long counter separates customers from the employee in charge of the store. The licensed premises share a common concrete block wall with Perry's Disco, a disco and game room operated by Respondent in the same building. There is no door or other opening between the licensed premises and the disco. The disco is not licensed by the Division, and

---

[1] Both parties submitted proposed findings of fact. The proposed findings of fact were reviewed, and the following Findings of Fact attempt to rule, either directly or indirectly, on each proposed finding of fact. Proposed findings of fact which were approved and adopted are reflected in the following Findings Of Fact. Where proposed findings of fact are not reflected and no direct ruling rejecting them is apparent, the proposed findings of fact have been rejected as being subordinate, cumulative, immaterial or unnecessary.

patrons of the disco routinely walk around the outside of the building to the licensed premises to buy food and drink which they then take back to the disco for consumption.

3. It is common knowledge in the area, and known to Respondent, that illegal drugs are used and sold in the area of Respondent's licensed premises.

4. In September, 1984, the Division sent all applicants for license renewal at the time, including Respondent, a letter directing the licensees' attention to the problem of illegal drug activity at licensed premises by employees and/or patrons (as well as the problem of illegal sale or distribution of alcoholic beverages to minors.) The letter put Respondent on specific notice: "A showing of negligence on your part in supervising your licensed business whereby these activities occur can result in the revocation of your alcoholic beverage license. It is not enough for you to take the position that you do not condone or tolerate these acts or that you were not aware of these activities at your place of business. You must actively manage your business in such a manner as to be aware of the activities of your employees and to prevent . . . the persistent sales and use of drugs at your premises by employees or the open use and/or sale of drugs by patrons in your place of business." The letter went on to say: "The important thing is for you to become concerned enough to ask for help."

5. On or about September 21, 1984, the Division gave Respondent oral notice of "possible complaints" of illegal drug violations on the licensed premises and written Official Notice "that it is a violation of Florida Statutes 893.13 to keep or maintain a premises resorted to by persons using controlled substances as defined in 893.13."

6. In early 1985, Tallahassee Police raided Perry's Disco and arrested several people for illegal drug violations. Respondent himself was arrested on charges of having maintained the licensed premises as a structure or place which is resorted to by persons for the purpose of keeping or selling illegal drugs.

9. After the police raid, in early 1985, Respondent, who personally is opposed to the use or sale of illegal drugs, took several steps to rid his establishment of illegal drugs.

Almost immediately, Respondent arranged a meeting with Lt. B. A. Watts, the Division's new district supervisor for the Tallahassee area. Respondent told Watts that he was trying to keep his place clean and that he would be able to give Watts useful information. A few days later, Respondent telephoned Watts and told him that he was "working on it."

Respondent hired a new and responsible manager whose job it was to police both the disco and the licensed premises and to supervise the employees. Respondent met with the manager, and they agreed that the manager would hold meetings with the employees every one to two months to be sure that the employees continued to be impressed with the seriousness of illegal drugs on the premises and the importance of their responsibilities in relation to it. It is also the manager's job to evict any suspected violators of the drug laws and, if necessary, to call the police. The manager specifically impressed upon the employees their responsibility to evict suspected violators of the drug laws, and if necessary, to call the police.

Next, Respondent hired physically imposing men to act as uniformed security guards or bouncers. The job of the security guards was to police both the disco and the licensed premises and to evict suspected violators of the drug laws and, if necessary, call the police.

In addition, Respondent had his wife make handwritten signs prohibiting the use or sale of drugs on the premises. Several of these signs were posted in both the disco and the licensed premises. In the disco, Respondent also had his disc jockeys make periodic announcements over the loudspeaker system to the effect that possession, use or sale of drugs was prohibited. These announcements were made either by the disc jockey himself or by tape recording.

Respondent also arranged with Watts to have a Division employee come to the licensed premises to speak with Respondent and Respondent's employees about the responsibilities of Respondent and his employees in connection with illegal drug violations on the premises. Respondent was one of only one and a half to two percent of the licensees in Leon County to take advantage of this program offered by the Division. It was arranged that the Division program would take place at the disco on March 10, 1985. Respondent and practically all of his employees, including two named Nadine and Randle, attended the program. The program was comprehensive and specifically notified those in attendance that it was illegal not only to sell, possess, deliver or buy illegal drugs, but also to act as a go-between in illegal drug transactions. The program included a suggestion that Respondent begin using employment applications, begin screening employees and require employees to submit to polygraph examinations on the subject of illegal drug activities.

Respondent then met with Mussa Juggar, a long-time area resident with a history of leading anti-drug abuse campaigns in the neighborhood, and his assistant Howard Conoly to develop a strategy for

174

combating illegal drug violations. The three decided to arrange a meeting with the Tallahassee Police Department to enlist its aid.

In approximately May, 1985, Juggar and Conoly met with Tallahassee Police Department Chief Robert McBride. The purpose of the meeting was to give Chief McBride important information and to ask for the help of the Tallahassee Police Department to prevent illegal drug use in establishments like Respondent's. At the meeting, McBride was told that Respondent wanted to work with the Tallahassee Police Department. Juggar and Conoly also requested that the Tallahassee Police Department place undercover agents in the area to help root out drug problems. They also asked McBride to send some his law enforcement officers to the licensed premises to talk to the employees about illegal drugs.

The focus of all of these precautionary measures was the disco. All of the Respondent's known drug problems were in the disco. The disco, not the store, had been raided by the Tallahassee Police. The disco was dark and noisy, conditions conducive to illegal drug transactions. In contrast, the licensed premises were small, relatively quiet and well-lighted. The interior of the licensed premises was clearly visible through the entrance door from the street. In comparison to the disco, Respondent never thought he had a serious problem at the licensed premises.

As a result of the precautionary measures, a marked decrease in violations of the drug laws in the disco was noticed. The prevalence of the aroma of marijuana in the disco decreased significantly.

8. In approximately June, 1985, a second meeting with Chief McBride was held. Respondent himself attended the second meeting, along with Juggar and Conoly. At the second meeting, Respondent reported to McBride the precautionary measures he had taken since the first meeting. Respondent reiterated his request for undercover agents of the Tallahassee Police Department to more effectively root out drugs in the area. Respondent went so far as to ask Chief McBride to have undercover agents "test" his employees by proposing illegal drug transactions and to arrest any employees or patrons who failed the "test." McBride expressed concern that the covers of too many undercover agents would be blown in the process. Instead, he recommended that Respondent and his employees police the place themselves and telephone any intelligence they developed, such as names and car tags.

At one point in the conversation, Respondent and Juggar reported to McBride that an enormous amount of drugs was flowing into the area

175

through the establishment directly across the street from Respondent's establishment. They told McBride the name of the establishment, the Starbrite Game Room, and the name of the owner, a person called Star. In delivering this intelligence, they ran a considerable personal risk in the event it was leaked that they had given the information. McBride, whose Tallahassee Police Department did not yet have the information, had the information checked out, and it was accurate.

During the meeting, McBride also recommended that Respondent put brighter lights in the bathrooms and corners of the disco and lock the back entrance door of the disco. After the meeting, Respondent followed through and complied with this suggestion.

Again, the focus of all the participants in the meeting was the disco, not the licensed premises, since all believed illegal drug transactions would be more likely to occur in the disco.

9. Respondent and Juggar also discussed other ways Respondent could help rid the area of illegal drugs. They agreed that Respondent would participate in an anti-drug rally. Respondent contributed money to pay the band and helped advertise the rally. Juggar told other area merchants of Respondent's concern and active role. Respondent also agreed to talk to young people to dissuade them from the use of illegal drugs.

Respondent and Juggar agreed that Respondent would have all his employees sign a pledge that they would not engage in the sale or use of drugs or knowingly allow others to and that they would take whatever actions necessary, except bodily force, to expel persons who do use or sell drugs on the premises. Employees Nadine and Randle already had signed this pledge in November, 1984.

After discussing the Division's proposal to polygraph all employees, Respondent concurred with the recommendation of Juggar and Conoly that the employees should not be polygraphed.

Finally, Respondent had two of his most trusted employees, Nadine and Randle, rotate duties behind the counter in the licensed premises. Both had been employees for at least five years, and neither Respondent nor Juggar had any idea that they were inclined to become involved in illegal drug transactions. This freed Respondent to be physically present in the disco most of the time he was at the building.

10. Respondent did not follow through and comply with the Division's suggestion to use employment applications and screen prospective employees. Neither of these procedures had been used during the employment of Nadine and Randle. Neither did either the Division or

176

the Tallahassee Police Department give Respondent any information that would raise suspicion as to the trustworthiness of Nadine or Randle.

11. His precautionary measures in place, Respondent operated his business during the summer of 1985. As before, Respondent focused on the disco, relying on Nadine and Randle, together with periodic policing by the manager and the bouncers, to operate the licensed premises properly. Approximately two times, Juggar smelled the aroma of marijuana while he was in the disco and told Respondent. Although the customers denied Respondent's accusation, Respondent evicted them from the disco. On a couple of occasions Respondent or his employees had to telephone the Tallahassee Police on account of drug problems. One time, a customer in the disco was found trying to inject himself with drugs using a hypodermic needle. When Respondent's employees tried to evict the name, he became violent and the manager called the police. By the time the police arrived, the man had left the premises and could not be found. On another occasion, Respondent or his employees became aware of a pusher selling drugs in the disco and called the police. When the police arrived, Respondent demanded that the man be arrested for drug violations, but the police could find no drugs. The police tried to explain to Respondent that there was insufficient evidence to charge the man with drug violations. Respondent became frustrated and angry.

In general, illegal drug activities in the disco became less prevalent as a result of Respondent's precautionary measures. Respondent was never aware of any significant drug problems in the licensed premises.

12. During the summer of 1985, the Division began cooperating with the Tallahassee Police Department in an investigation of illegal drug activities in the Macomb Street area. Division investigators Thompson and Houston frequented area establishments, mostly together. They observed illegal drug activities on the street and in several local establishments, including the Starbrite Game Room across the street from the licensed premises. However, early in the investigation, Thompson became involved in the altercation in the Starbrite and he did not return to that establishment. Later in the investigation, the Division revoked the Starbrite's temporary license because of the owner's prior felony convictions, and the Division no longer had any need to investigate the Starbrite.

13. As part of their investigation, Thompson and Houston visited Perry's Disco and the licensed premises on at least eleven separate occasions. Out of all these visits, Thompson and Houston smelled the

**177**

aroma of marijuana only one time—in the disco. Neither Thompson nor Houston observed any illegal drug activities in either the disco or the licensed premises except in connection with drug deals in which they participated as undercover agents.

14. Thompson and Houston made their first buy late in the evening on July 16, 1985. This was the occasion on which there was the prevalent aroma of marijuana in the disco. Thompson then walked next door to the licensed premises and began a conversation with Randle, who was behind the counter. Thompson asked Randle whether he had any cocaine for sale. Without any further prompting or persuading, Randle replied that he could get some and called over the counter to a black male known as Big Joe. Thompson and Big Joe discussed the purchase of cocaine in a normal, loud tone capable of being heard particularly throughout the licensed premises. There was evidence that customers came in and out of the package store on and off but there was no evidence that anyone other than Thompson, Big Joe and Randle were in the licensed premises when the conversation about cocaine or the actual transaction was taking place. To complete the transaction, Big Joe took out a light-colored pouch, placed it on the counter in front of Randle and Thompson, opened it and pulled out one plastic baggie of cocaine. Thompson gave Big Joe $20 in currency and Big Joe gave him a packet of cocaine, a controlled substance.

15. Late in the evening on July 19, 1985, Thompson and Houston returned to the licensed premises. Thompson went in and Houston waited outside. Randle was on duty in the licensed premises. When Thompson entered, there was no evidence that anyone else other than a black male known as Bear was in the licensed premises. When Thompson asked Randle for cocaine, Randle called over to Bear and asked him to get Thompson some cocaine. Bear declined, explaining that there were police foot patrols in the area, and suggested that Thompson come back later. Thompson left.

Later in the evening on July 19, Thompson returned to the licensed premises. Both Randle and Nadine were on duty in the licensed premises this time. When Thompson entered he asked Randle if he had obtained any cocaine. Randle walked from behind the counter to the front door and returned followed by Big Joe. Big Joe pulled out of his pocket a Skoal Tobacco can containing approximately 15 to 20 packets of cocaine. In front of Randle and Nadine, Big Joe laid the can on top of the store counter and took out a packet of cocaine. Nadine asked Big Joe to move the cocaine further down towards the side of the counter so that it would not be directly in front of the doorway. Big Joe commented to Nadine that he was going to take the packets out of

178

the Skoal can and put them in his pocket so that they would be easier to sell. He then gave one packet to Thompson in exchange for $20 in currency. There was no evidence that anyone other than Thompson, Randle, Nadine and Big Joe were in the licensed premises at the time of these conversations regarding cocaine and the cocaine transaction itself.

16. Before Thompson left the licensed premises on July 19, he asked Randle if it would be possible for Randle to have the cocaine ready for him to buy whenever he arrived at the store instead of Randle having to run down Big Joe or Bear every time. Randle suggested that Thompson telephone him at the licensed premises before coming and gave Thompson the telephone number.

17. Thompson and Houston returned to the licensed premises on July 20, 1985. They asked for cocaine again, but Randle told them no one was there and suggested that they go across the street to the Starbrite Game Room.

18. Thompson and Houston returned to the licensed premises late in the evening on August 12, 1985. Again, there was no evidence that anyone was in the licensed premises at the time other than on-duty clerks Randle and Nadine, Thompson and Houston. Again, Thompson asked Randle if he had any cocaine available for purchase. Randle replied that he did not but that it was available across the street at the Starbrite. Houston gave Randle $20 in currency. Randle took the money and left the licensed premises, returning a short time later with a clear plastic capsule filled with cocaine which he gave to Houston.

19. Early in the evening on August 14, 1985, Thompson and Houston returned to the licensed premises. Nadine was on duty behind the counter. Thompson asked Nadine whether she had any cocaine available for purchase. Nadine called to an unidentified individual who was in the licensed premises and asked him to go across the street for her. Thompson gave Nadine $20 currency which Nadine handed to the unidentified individual who went across the street. A short time later the individual returned, saying Nadine would have to go herself. Nadine went to the door of the licensed premises, waved across the street and yelled across the street that she was working and could not come over. She then called to the same unidentified individual, who by this time was just outside the licensed premises, to go across the street again. The unidentified individual went across the street and returned a short while later with a clear plastic capsule filled with cocaine. Nadine, who was busy behind the counter, motioned to the unidentified individual to give the capsule to Thompson. After the individual gave

179

Thompson the cocaine, Nadine put a beer on the counter for the unidentified individual, free of charge.

There was no evidence that anyone was in the licensed premises during the conversations and transactions on August 14, other than Thompson, Houston, Nadine and the unidentified individual.

20. On the following evening, August 15, 1985, Thompson and Houston returned to the licensed premises. This time Randle asked Thompson whether he wanted cocaine and whether Thompson wanted Randle to go get it for him. Thompson answered that he did and gave Randle $20 in currency. Randle called to a person known as Dirt Dog who was standing outside the licensed premises and gave him the money. Dirt Dog left and returned a short time later with a capsule of cocaine which he gave to Thompson. Dirt Dog told Randle that the guy across the street at the Starbrite wanted to know who the cocaine was for, and Randle told Dirt Dog that it was for him, Randle. Again, there was no evidence that there was anyone on the licensed premises during these conversations and transactions other than Thompson, Houston, Randle and Dirt Dog.

21. On the following evening, August 16, 1985, Thompson returned to the licensed premises. Nadine was on duty behind the counter. While Thompson was in the licensed premises, Big Joe entered, walked to the counter and asked Thompson if he wanted some cocaine. Thompson said he did, and Big Joe pulled out a Skoal Tobacco can containing several packets of cocaine. He laid one packet on the counter. Thompson took the packet and gave Big Joe $20 in currency. This transaction occurred directly in front of Nadine, but there was no evidence that there was anyone else in the licensed premises.

22. In the late afternoon of August 17, 1985, Thompson returned to the licensed premises where Randle was on duty behind the counter. While Thompson was at the counter, an individual known only as the "new kid on the block," from whom Thompson had bought cocaine in front of another establishment in the Macomb Street area, came up to Thompson at the counter. Thompson asked this "new kid" whether he had cocaine for sale. The seller said he did and left the premises. A short time later the seller returned to the door of the licensed premises and called Thompson to the door. Just outside the licensed premises, Thompson was handed a piece of cocaine for $10 currency.

Thompson's conversations with the "new kid" were in a loud voice. But there was no evidence that anyone other than Thompson, Randle and the "new kid" were in the licensed premises at the time.

23. Later, on August 17, 1985, Thompson telephoned Randle at the

180

licensed premises and arranged to buy cocaine when he arrived. Later in the evening, Thompson and Houston returned to the licensed premises. When they entered the store, Randle reached behind the counter and then placed a small folded napkin on the counter. Thompson placed $20 in currency on top of the counter and took the napkin which contained cocaine.

Houston then asked to buy some cocaine. Randle called to Dirt Dog who was in the licensed premises during this time and asked him to go across the street to get some more cocaine. Houston gave Dirt Dog $20 in currency and Dirt Dog left the premises. Dirt Dog returned a short time later and handed Houston a clear capsule of cocaine.

There was no evidence that anyone was in the licensed premises during these conversations and transactions other than Thompson, Houston, Randle and Dirt Dog.

24. Late in the following evening, August 18, 1985, Thompson and Houston returned to the licensed premises. Randle was on duty behind the counter. Thompson asked Randle if he had seen Big Joe. Randle said that he had not but that Big Joe would be around. Randle then turned to Bear, who was in the licensed premises, and asked Bear if he had any cocaine. Bear said he did not but would check. Thompson told Bear that he and Houston would be in the disco. There was no evidence that anyone other than Thompson, Houston, Randle and Bear were in the licensed premises during these conversations.

A short time later, Dirt Dog entered the disco and told Thompson that Randle wanted to see him in the package store. Thompson left the disco and walked around to the package store. At the counter in the licensed premises, Bear gave Thompson a small tin-foil packet of cocaine and said the price was $10. Thompson gave Randle a $20 bill to change and then gave Bear $10 for the cocaine. There was no evidence that anyone was within hearing range of these conversations or the transaction other than Thompson, Randle, Bear and Dirt Dog.

25. Later in the evening on August 18, 1985, Houston went from the disco to the licensed premises and asked Randle if the guy with the cocaine was still around. Randle asked an unidentified individual who was near them at the middle of the counter to check outside to see if Bear was still there. A short time later, Bear entered the licensed premises and asked if Randle had sent for him. Houston asked Bear for some cocaine, and Bear handed her a tinfoil packet of cocaine in exchange for $10. There was no evidence that anyone other than Houston, Randle, Bear and the unidentified individual were at the licensed premises during these conversations and transaction.

26. When the Division served an emergency suspension order on Respondent on August 28, 1985, Respondent fired Randle and Nadine. The next day he telephoned Division District Supervisor, Lt. Watts and again said that he was trying to keep his place clean and that he could help the Division by providing intelligence. Although Respondent has given intelligence to the Tallahassee Police, as reflected in paragraph 8 of these Findings of Fact, Respondent never actually gave intelligence to the Division.

27. Randle and Nadine were willing participants in the illegal drug violations at the licensed premises. Respondent had no actual knowledge and did not actually condone or foster the drug violations on his licensed premises. The violations were sufficient in their number and their persistent and practiced manner to permit an inference that Respondent constructively knew of, condoned and fostered the violations. But, taking the evidence as a whole, it is found that Respondent exercised due diligence and was not negligent in supervising the operation of the licensed premises. It is found that Respondent's efforts to eliminate illegal drug violations at the licensed premises and the disco were made in good faith and not just for the sake of appearances to help protect his license in the event the Division detected violations.

### CONCLUSIONS OF LAW

1. Section 561.29, Florida Statutes (1983), contains the following relevant provisions:

(1) The division is given full power and authority to revoke or suspend the license of any person holding a license under the Beverage Law, when it is determined or found by the division upon sufficient cause appearing of:

(a) Violation by the licensee or his or its agents, officers, servants, or employees, on the licensed premises, or elsewhere while in the scope of employment, of any of the laws of this state or of the United States, or violation of any municipal or county regulation in regard to the hours of sale, service, or consumption of alcoholic beverages, or engaging in or permitting disorderly conduct in the licensed premises, or permitting another on the licensed premises to violate any of the laws of this state or of the United States. . . .

(b) Violation by the licensee . . . of any laws of this state or any state or territory of the United States.

(c) Maintaining a nuisance on the licensed premises.

. . . . . . . . . . .

(3) The division may impose a civil penalty against licensee for any

182

violation mentioned in the Beverage Law, or any rule issued pursuant thereto, not to exceed $1,000 for violations arising out of a single transaction. If the licensee fails to pay the civil penalty, his license shall be suspended for such period of time as the division may specify.

2. Section 823.10, Florida Statutes (1983), declares place or building where controlled substances are illegally kept, sold, or used, to be a nuisance.

3. Section 893.13(2)(a)(5), Florida Statutes (1983), makes it unlawful for any person:

To keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place which is resorted to by persons using controlled substances in violation of this chapter for the purpose of using these substances, or which is used for keeping or selling them in violation of this chapter.

4. Cocaine is a controlled substance. It is a violation of state law to sell, use, deliver, or possess cocaine. Section 893.13, Florida Statutes (1983).

5. The negotiation of a sale of a controlled substance or the act of serving as a go-between in arranging such a drug transaction is a violation of Florida law, and a person committing any such acts is subject to conviction under the criminal laws of Florida. *Nadjawski v. State*, 371 So.2d 554 (Fla. 2d DCA 1976); *State v. Hubbard*, 328 So.2d 543 (Fla. 2d DCA 1976); *State v. Dent*, 322 So.2d 543 (Fla. 1975); Section 777.011 Florida Statutes (1983).

6. Respondent's employees Randle and Nadine violated Sections 893.13 and 777.011, Florida Statutes (1983). They were not entrapped by Thompson and Houston. Their participation in the illegal drug transactions was voluntary.

7. Randle and Nadine violated Florida drug laws while they were in the scope of their employment. Neither the fact that Respondent was not in the business of dealing in illegal drugs nor the fact that Randle and Nadine signed pledges not to violate the drug laws takes them out of the scope of their employment for purpose of Section 561.29(1)(a), Florida Statutes, (1983).

8. Respondent is held accountable for the violations of Randle and Nadine if he was culpably responsible by reason of his own negligence, intentional wrong doing or lack of diligence. *Pauline v. Lee*, 147 So.2d 359 (Fla. 2d DCA 1962). In *Pauline v. Lee*, the court held:

The persistent and practiced manner with which the solicitations [for

prostitution] described by the state's witnesses were made is sufficient to permit a factual inference leading to the conclusion that such violations of law were either fostered, condoned or negligently overlooked by the licensee notwithstanding his absence from the premises on the dates in question.

*Id.* at 364. See also *Taylor v. State Beverage Department,* 194 So. 2d 321, 325 (Fla. 2d DCA 1967). The evidence in *Pauline v. Lee* consisted of five separate solicitations for prostitution by five different employees of the licensee.

9. In *Lash, Inc. v. State Department of Business Regulation,* 411 So.2d 276 (Fla. 3d DCA 1983), the operative facts before the court were:

The license revocation stemmed from narcotics violations on appellant's premises. The evidence established that on five occasions over a period of a week, undercover beverage agents purchased controlled substances from two of appellant's employees.

10. At page 278 of its decision, the court in *Lash* applied the standard for revocation or suspension of a beverage license to the facts of that case:

Under Section 561.29(1), where the unlawful activity is committed by the Licensee's agent, simple negligence is sufficient for revocation. Admittedly, the courts have refused to uphold revocations when the evidence showed only that on one occasion the licensee's employees violated the laws, and that the licensee otherwise took measures to comply with them. (Citations omitted.) Where, however, the laws are repeatedly and flagrantly violated by the employees, an inference arises leading to the conclusion that such violations are either fostered, condoned or negligently overlooked by the licensee, notwithstanding his absence from the premises when the violations occur. (Citations omitted.) Consequently, if the evidence supports the conclusion that the licensee failed to exercise ordinary care in the maintenance of the licensed premises or the supervision of his employees, he can be found negligent and his license revoked. (Citation omitted.)

Where the violations are, as here, committed in a persistent and recurring manner, consisting of more than one isolated incident, the courts have not hesitated to find that such violations were either fostered, condoned, or negligently overlooked by the licensee, even though he may have been absent at the time of the commission of such. (Citations omitted.) In the present case, the recurring sales were made possible by appellant's failure to supervise the premises

184

and his employees in a reasonably diligent manner, properly leading to the license revocation.

Although the court in *Lash* permitted the Division to draw an inference that the licensee negligently overlooked the violations or failed to exercise ordinary care in the maintenance of the licensed premises or supervision of his employees based upon the operative facts in *Lash,* it is noted that there is less basis for an inference of negligent oversight in a case involving relatively discreet drug transactions than in cases involving open solicitation for prostitution or lewd and lascivious behavior such as the cases which appear to have given rise to the law applied in *Lash.*[2]

11. In this case, there were more violations by the same number of employees over a longer period of time than in the *Lash* case. Accordingly, the violations established in this case establish a prima facie case and would be sufficient, in and of themselves, to support an inference of the type drawn in *Lash.* However, *Lash* only permits such an inference to be drawn; it does not require the inference to be drawn. In this case, Respondent presented evidence to rebut any inference that he negligently overlooked the violations or failed to exercise ordinary care in the maintenance of the licensed premises or the supervision of his employees. Therefore, all the evidence must be considered in determining whether Respondent is culpably responsible.

12. As reflected in the Findings Of Fact above, the evidence in this case as a whole, did not prove that Respondent either condoned or fostered illegal drug activities on the licensed premises. It did not prove that the licensee was inattentive to the business or ignorant or indifferent to what happened on the licensed premises. Nor did the evidence prove that the licensee negligently overlooked the violations that occurred on the licensed premises.

13. A licensee has a duty to exercise reasonable diligent in the selection of employees and in the training and instruction of employees. Respondent did not require Randle and Nadine to complete employment applications or be screened. But they were long-term employees whom Respondent had no valid reason to believe were involved in illegal drug activities. Respondent did make it a policy to, and was

---

[2] The first application of the inference appears to be *Pauline v. Lee, supra.* It has since been applied in a number of what euphemistically may be described as "exotic" dancer cases. See, the *G & B of Jacksonville* cases beginning at 371 So.2d 137, and *Golden Dolphin No. 2, Inc. v. State Division of Alcoholic Beverages and Tobacco,* 403 So.2d 1372 (Fla. 5th DCA 1982). A discreet drug transaction is more difficult to detect.

diligent in taking steps to, be sure that all employees knew his policies against illegal drugs on the premises. He has his employees, including Randle and Nadine, sign a pledge to follow his policies. Respondent discussed the subject with his manager and had his manager hold meetings every one to two months in which the manager reminded the employees of Respondent's prohibition against the possession, use or sale of illegal drugs and of their responsibility to evict patrons violating the policy and, if necessary, to call the police. He had signs on the premises prohibiting illegal drugs possession, use or sale. He was one of one and one-half to two percent of the licensees in Leon County who took advantage of the Division's offer to put on a program to educate his employees and make them aware of the law on illegal drugs and on their responsibilities in connection with illegal drugs. Randle and Nadine, as well as practically all of Respondent's employees, attended the program.

14. A licensee also has a duty to supervise his employees and exercise reasonable diligence to detect and arrest wrongdoing on their part.

Respondent took reasonable precautionary measures. Respondent spent most of his time at the disco, but his personal supervision of the licensed premises was reasonably diligent in that he had reason to believe most of his problems with drugs would occur in the disco, not in the licensed premises. Respondent hired a responsible manager and security guards who policed both the disco and the licensed premises. Lighting in the licensed premises was good. Respondent also took several measures to help control the problem of illegal drug violations upon the licensed premises by patrons. He placed signs in both the disco and the licensed premises prohibiting illegal drug use, possession or sale. He had announcements made in the disco periodically that drug possession, use or sale was prohibited.

Respondent solicited the assistance of local community leaders and the Tallahassee Police, even to the point of asking the police to send undercover agents into the area and his establishments to make cases against customers who broke the drug laws and to "test" his employees. The Tallahassee Police declined to meet Respondent's request but suggested that Respondent police his own establishments, improve lighting in the disco and lock the back door of the disco. Respondent complied with all of the suggestions of the Tallahassee Police Department. Respondent also gave the Tallahassee Police Department important intelligence information regarding the source of illegal drugs in the area. Respondent gave this information at considerable risk of personal harm.

186

Although Respondent knew that the possibility of illegal drug activities at his establishment was a serious problem because of the level of illegal drug activities in the area, he took reasonable steps to police his establishment. About the only other thing Respondent could have done would have been to polygraph his employees. In light of the failure of the precautionary measures Respondent took, he would be well advised to immediately require all employees to complete employment applications and be screened and to take polygraph examinations concerning illegal drugs in order to avoid future discipline of his license. But the evidence in this case did not prove the measures Respondent had taken fall short of the legal standard of care.

15. Section 561.29(1)(a), Florida Statutes (1983), also prohibits a licensee from "permitting another [i.e. someone other than himself, his agents, officers, servants or employees] on the licensed premises to violate any of the laws of this state or the United States. . . ." The evidence established that patrons on the licensed premises known as Big Joe, Bear, Dirt Dog and "the new kid on the block" violated drug laws on the licensed premises. But there was no evidence that Respondent actually or constructively permitted anyone to conduct illegal drug activities on the licensed premises. Therefore, it must be concluded that Respondent did not permit those individuals to conduct illegal drug activities on the premises. See, *Jones v. State Department of Business Regulation*, 448 So.2d 1109 (Fla. 1st DCA 1984). Cf. *Bach v. Florida State Board of Dentistry*, 378 So.2d 34 (Fla. 1st DCA 1980).

16. The Division also charges that Respondent was "[m]aintaining a nuisance on the licensed premises" in violation of Sections 561.29(1)(c) and 823.10, Florida Statutes (1983), and was violation Section 893.13(2)(a)(5), Florida Statutes (1983), which makes it unlawful for any person "[t]o keep or maintain any store . . . which is resorted to by persons using controlled substances in violation of this chapter for the purpose of using these substances, or which is used for keeping or selling them in violation of this chapter." A literal reading of those statutes, like 561.29(1)(a), "would indicate that a liquor licensee is under the onus of suspension or revocation . . . irrespective of his own personal fault in connection therewith." *Pauline v. Lee, supra* at 364. But, like Section 561.29(1)(a), those statutes must be read to require proof of culpable responsibility by the licensee as a result of his own negligence, intentional wrongdoing or lack of diligence in order to warrant discipline of his license. As previously explained, proof in this regard was insufficient in this case.

### RECOMMENDATION

Based on the foregoing Findings Of Fact and Conclusions Of Law, it

is recommended that Petitioner, Department of Business Regulation, Division of Alcoholic Beverages and Tobacco, enter a final order dismissing the charges against Respondent, Alex Perry d/b/a Perry's Package Store, contained in the Notice To Show Cause in this case.

RECOMMENDED this 3rd day of October, 1985, in Tallahassee, Florida.